**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE**

| | | |
|---|---|---|
| STEPHEN VALDEZ, JEFFREY WARE, | ) | |
| RUBEN FREYRE, and ARMANDO | ) | |
| CASTROVERDE, individually and | ) | |
| on behalf of all others similarly situated, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Cause No. _____ |
| | ) | |
| AIR LINE PILOTS ASSOCIATION, | ) | JURY TRIAL DEMANDED |
| INTERNATIONAL, | ) | |
| | ) | |
| Defendant. | ) | |

**<u>CLASS ACTION COMPLAINT FOR DAMAGES</u>**

**TABLE OF CONTENTS**

Parties, Jurisdiction, and Venue…………………………………………………………...3

Overview of Plaintiffs' Claims……………………………………………………………....4

Factual Allegations…………………………………………………………………………...4

      ALPA Governance and CBA Formation……………………………………………4

      History of FedEx Pilots and Their Representation………………………………………..5

      The 2011 Interim Agreement………………………………………………………...6

      FedEx Pilots' Compensation Expectations………………………………………………..7

      The 2015 CBA Pay Scale……………………………………………………………9

      Signing Bonus……………………………………………………………………………..10

      ALPA is Warned of the Shortfalls, but Misrepresents Anyway…………………………12

      ALPA is Repeatedly Informed of the Shortfalls……………………………………………12

      ALPA Misrepresents FedEx's Ability to Improve Retirement Benefits…………….......14

      ALPA Misrepresents the Sick Leave Buyback…….…………………….…..………...16

      ALPA Continues to Mislead the FedEx Pilots……………………………………………17

      ALPA Leaks Confidential Information; the CBA is Put to a Vote………………………18

      ALPA Continues to Misrepresent and Hushes Dissenters………………………………20

      The New CBA is Ratified…………………………………………………………..23

      The MEC Runs Out of Money……………………………………………………...23

      FedEx Could Have Covered the Shortfalls………………………………………………26

Class Action Allegations…………………………………………………………………....27

Count I-Breach of the Duty of Fair Representation………………………………………...29

Prayer for Relief……………………………………………………………………………31

Pursuant to Fed.R.Civ.Pro. 23, Plaintiffs Stephen Valdez ("Valdez"), Jeffrey Ware ("Ware"), Ruben Freyre ("Freyre"), and Armando Castroverde ("Castroverde"), individually and on behalf of all others similarly situated, for their class action complaint for damages against Defendant Air Line Pilots Association, International ("ALPA"), state as follows:

### Parties, Jurisdiction, and Venue

1.      Valdez is an individual residing in Broward County, Florida. He is a Boeing 777 First Officer for Federal Express Corporation ("FedEx") based in Memphis, Tennessee, and has been a FedEx pilot since 1998.

2.      Ware is an individual residing in Miami-Dade County, Florida. He is a Boeing 767 Captain for FedEx based in Memphis, Tennessee, and has been a FedEx pilot since 1989.

3.      Freyre is an individual residing in Miami-Dade County, Florida. He is a Boeing 777 Captain for FedEx based in Memphis, Tennessee, and has been a FedEx pilot since 1983.

4.      Castroverde is an individual residing in Shelby County, Tennessee.  He is an MD-11 Captain for FedEx based in Memphis, Tennessee, and has been a FedEx pilot since 1985.

5.      Defendant ALPA is a labor union that represents air line pilots worldwide.  ALPA is the certified bargaining representative of all 4,190 FedEx pilots.

6.      The Court has personal jurisdiction over ALPA because ALPA has purposefully availed itself to the benefits of conducting business in Tennessee, and this dispute arises out of ALPA's contacts with the state of Tennessee.  ALPA is further subject to general jurisdiction in Tennessee because it maintains a permanent office in this State.

7.      The Court has subject matter jurisdiction because this controversy arises under federal law, namely the Railway Labor Act, 45 U.S.C. §§ 151, *et seq.*

8.     Venue is proper in this District under 28 U.S.C. §§ 1391 because ALPA does business in this district, namely, representing the thousands of FedEx pilots currently based in Memphis. Memphis is the largest base for FedEx pilots. Venue is also proper in this District because ALPA is subject to personal jurisdiction in this District and maintains an office in this District.

## Overview of Plaintiffs' Claims

9.     On October 20, 2015, the ALPA-represented FedEx pilots narrowly ratified a new Collective Bargaining Agreement (the "2015 CBA") between FedEx and ALPA that will govern the pay, work rules, and working conditions of all FedEx pilots through 2021.

10.     As alleged in detail below, ALPA engaged in many forms of misconduct in connection with the ratification of the 2015 CBA, breaching its duty of fair representation. Among other things, ALPA knowingly and recklessly misrepresented material aspects of the 2015 CBA prior to its ratification, specifically its pay, signing bonus, and retirement bonus provisions; misrepresented FedEx's ability to make improvements to the pilots' Defined Benefit Plan (the "A Plan"); engaged in improper fear-mongering tactics; and depleted itself of the financial resources necessary to effectively negotiate with FedEx.

11.     But for ALPA's misconduct, the 2015 CBA would not have been ratified by the FedEx pilots.

## Factual Allegations

## ALPA Governance and CBA Formation

12.     ALPA is the largest pilots' union in the world, representing nearly 50,000 pilots.

13.     ALPA is structured as a unitary union with no locals.  Instead, pilots at each ALPA-represented airline elect a Master Executive Council ("MEC) to carry out the union's business at that airline.

14.     At FedEx, the MEC contains 14 voting members.  Those 14 members are elected from seven Local Executive Councils ("LECs") that correspond to FedEx's pilot bases in Memphis, Indianapolis, Los Angeles, Anchorage, Hong Kong, and Cologne, Germany.  The LECs themselves consist of voting and non-voting "Block or Domicile Representatives" selected by the pilots within a specific seniority range or by domicile.

15.     For the purpose of negotiating a new CBA with the company, that airline's MEC appoints a "Negotiating Committee" to negotiate with the company.  Both the MEC and the Negotiating Committee are agents of ALPA for the purposes of negotiating new CBAs.

16.      Once the Negotiating Committee reaches a Tentative Agreement with the company, it must be approved by the MEC by a majority vote before the Tentative Agreement is put to a ratification vote by the members.  A majority of eligible voters must vote in favor of a Tentative Agreement for it to become a new CBA.

17.     The MEC also handles ALPA's budget within the airline, which includes collecting union dues and managing the Negotiation Committee's budget.

### History of the FedEx Pilots and Their Representation

18.     FedEx began operations in 1972. At its inception, the FedEx pilots were not represented by a union.

19.     In 1989, FedEx completed a merger with Flying Tiger Line, acquiring its pilots, who were represented by ALPA.

20.     Three years after the merger, in 1992, the FedEx pilots certified ALPA as their official bargaining representative.

21.     After certification, ALPA and FedEx attempted to negotiate a new CBA for several years. ALPA and FedEx finally came to a Tentative Agreement in July 1996, but the FedEx pilots were extremely dissatisfied and overwhelmingly rejected it.

22.     Frustrated with ALPA, the FedEx pilots decertified ALPA and created their own independent union, the FedEx Pilots Association ("FPA"), which was certified in October 1996.

23.     FPA came to a Tentative Agreement with FedEx in March 1998, but it too was rejected by the pilot group.

24.     Less than a year later, in January 1999, FPA and FedEx sent a new Tentative Agreement out to the pilots, which was accepted on February 4, 1999.

25.     ALPA then began a campaign to re-unify the FedEx pilots, and in 2002, FPA merged into ALPA, and ALPA once again became the certified bargaining representative of the FedEx pilots.

26.     ALPA negotiated a new CBA with FedEx that was ratified in 2006.

### The 2011 Interim Agreement

27.     In 2010 and 2011, ALPA and FedEx were in the midst of negotiating a new CBA. However, it soon became apparent that the parties were nowhere close to reaching a comprehensive agreement.

28.     Instead, ALPA and FedEx entered into an Interim Agreement, designed to give the FedEx pilots some benefits while ALPA continued to negotiate a full CBA.

29.     The Interim Agreement had a one year term, and could be extended for an additional year by the MEC.

30.     The FedEx pilots approved the Interim Agreement, and it went into effect in March 2011. The MEC extended the Interim Agreement for another year in March 2012.

31.     Under the Interim Agreement, the FedEx pilots received a 3% pay raise in March 2011, and another 3% raise in March 2012. The Interim Agreement also included a small increase in retirement benefits.

32.     Despite FedEx's strong financial condition, ALPA was unable to negotiate any further raises for the FedEx pilots until November 2015 when the 2015 CBA went into effect. Those raises, however, did not meet the pilots' expectations as represented by ALPA.

**FedEx Pilots' Compensation Expectations**

33.     Once the Interim Agreement expired in March 2013, ALPA and FedEx began negotiations for a new full CBA.

34.     In typical pilot CBA negotiations, retroactive pay raises and signing bonuses are among the last items bargained for. This is because CBA negotiations are a drawn-out process and at the end of negotiations it is more definite what raises and bonuses the pilots have foregone during the course of negotiations.

35.     ALPA's stated intention in its negotiation with FedEx for a new CBA was to compensate the FedEx pilots for the raises they had missed since the expiration of the Interim Agreement in March 2013.

36.     The FedEx's pilots missed compensation was to take two forms. The first was a significant Date of Signing pay raise designed to bring pilot compensation up to the level it would have been had the pilots received typical raises since March 2013. Pilot compensation would then increase at an agreed-upon rate each year from the Date of Signing, using the

increased value as a baseline. The second was a signing bonus that would compensate pilots for their lost salaries due to the lack of any raise since March 2013.

37.     In a message sent to all FedEx pilots on May 4, 2015, Scott Stratton ("Stratton"), the MEC Chairman at the time, referenced the goal of acquiring this missed pay: "Do we expect industry-leading compensation? Yes we do. Part of Compensation discussions is retro pay or signing bonuses-delay has a cost."

38.     Stratton repeated that sentiment in another message on May 18, 2015: "Fact: Retro pay/signing bonuses are usually very endgame discussions. It is based on how long since the amendable date have we gone without a raise; delay costs."

39.     Stratton's messages also highlighted the fact that FedEx more than had the ability to pay for the pilots' lost wages. For example, in his May 18th message, he said "FedEx is highly profitable, and we've had more than ample time to bargain fair pay rates...*The company is highly profitable, which translates into the ability to afford fair and reasonable improvements."* (emphasis in original).

40.     Based on these representations, the FedEx pilots expected that the new CBA would fully compensate them for missed compensation since the expiration of the Interim Agreement in March 2013.

41.     Since the FedEx pilots received a 3% raise in March 2011 and again in March 2012, the FedEx pilots widely expected that the new CBA would at least give the pilots raises on the same "3% slope." In fact Don Ray ("Ray"), an MEC voting member, posted on a message board "a 3% year over year slope is considered to be the bare minimum."

**The 2015 CBA Pay Scale**

42.    When the Negotiating Committee finally announced the new pay scale and sent the Tentative Agreement for a vote, it appeared as if the FedEx pilots would receive their expected 3% "minimum" pay raises and corresponding signing bonuses.

43.    The Negotiating Committee recorded a series of webcasts to explain the terms of the Tentative Agreement (referred to as the "TA").  In "2015 TA Webcast 1" ("Webcast 1"), released on ALPA's website and Youtube on September 3, 2015,  the Negotiating Committee Chairman, Scott Larsen ("Larsen"), explained the new pay scale:

> We missed, on a slope of 3%, we would have missed our 3% pay increase on March of '13, we missed another one in March of '14, and we missed a third one in March of '15, which would have naturally carried us to the end of February bid pack period in 2016. So on that slope on what we needed on date of signing to catch up on a 3% slope, which is what we've averaged as FedEx pilots, we would need about 8%. As you see in Section 3 of the TA, we have 10% date of signing increases starting on November 2nd with this TA, so we did cover off the money that was lost.

44.    Negotiation Committee Chairman Larsen represented in Webcast 1 that the TA included a 10% Date of Signing raise for all pilots, which was meant to compensate them for missed raises between March 2012 and the Date of Signing. Furthermore, Larsen represented that all the pilots needed was an 8% raise to fully compensate them for missed pay, giving the impression that the 10% raise negotiated by the Negotiating Committee significantly exceeded expectations.

45.    Larsen's explanation in Webcast 1 was widely disseminated and discussed among the FedEx pilots. Due to the Negotiating Committee's representations, the FedEx pilots widely believed that they would be more than compensated for their missed raises.

46.    However, the Negotiating Committee significantly misrepresented the true pay raises needed to fully compensate the FedEx pilots. Larsen represented that an 8% increase was

9

all that was needed to catch up to the "needed" 3% slope. However, the actual raise necessary to catch up is calculated as follows:

> 3% raise (missed March 2013 raise)*3% raise (missed March 2014 raise)*3% raise (missed March 2015 raise)*2% raise (prorated year from March 2015 to Date of Signing in November 2015).

47.     This can be expressed by a simple formula: $1.03*1.03*1.03*1.02=1.1146$.

48.     Therefore, the FedEx pilots needed pay rates 1.1146 times higher, or an 11.46% raise, to recoup, as Larsen put it, the "money that was lost." The pay slope in the Tentative Agreement actually equated to roughly 2.63%, not the more than 3% that ALPA had represented.  So the FedEx pilots did not get the better deal that the Negotiating Committee touted; the actual raises did not even reach, as MEC member Ray put it, the "bare minimum" expectation.

49.     The difference between a 3% pay slope and a 2.63% pay slope is significant. Since the Date of Signing pay rate would be used as a baseline for future raises in the Tentative Agreement, each subsequent pay raise widens the gap between the Tentative Agreement rate and what the pay rate would actually be on a 3% slope. As a result, the 4,190 FedEx pilots will receive approximately $92 million less over the course of the CBA than they would have under the "needed" 3% slope.

50.     ALPA failed to disclose these facts to the FedEx pilots.  It instead continued to falsely represent that the Tentative Agreement the Negotiating Committee had negotiated offered more than a 3% pay raise slope.

**Signing Bonus**

51.     ALPA made similar misrepresentations relating to the signing bonus. As stated above, the signing bonus was meant to provide the FedEx pilots with a lump sum payment to compensate them for the raises foregone since the Interim Agreement expired in March 2013.

52.     In Webcast 1, Negotiating Committee Chairman Larsen stated:

The signing bonus was designed to capture the time lost with that money. The signing bonus being $134 million. In 2006 the signing bonus was $106 million.

53.     When asked how much this represented as a year-over-year increase, Larsen stated:

The $134 [million] equated to a recapture of almost 5% per year, on not having pay increases during 2013, 2014, and 2015.

54.     This was false, but again, the Negotiating Committee touted the Tentative Agreement as going above and beyond what was expected by the pilot group; i.e., a 3% "recapture" expected to an "almost 5%" "recapture" supposedly achieved.

55.     The Negotiating Committee further misrepresented the Tentative Agreement by comparing it to the 2006 CBA's signing bonus, wholly irrelevant for determining whether or not the new signing bonus really did "capture the time lost with that money."

56.     In reality, the $134 million signing bonus did not equal an "almost 5% per year" recapture, as the Negotiating Committee represented.  It did not even equate to the "needed" 3% slope. The difference is substantial.

57.     On an accurate 3% slope, the signing bonus would have been more than $147 million, equating to a total shortfall of more than $13 million.

58.     To hide its mistake, on October 1, 2015, the Negotiating Committee changed the represented value of the signing bonus in a message sent to all pilots. The Negotiating

Committee now claimed that the signing bonus was actually worth $145.2 million, and not the $134 million originally reported.  The extra value it now claimed came from incidentals such as employer-paid taxes and retirement plan contribution that actually make up no part of the signing bonus.

59.     Between the pay rate and signing bonus shortfalls, the FedEx pilots will receive approximately $105 million less than represented to them by the Negotiating Committee over the life of the 2015 CBA, or about $25,000 per pilot.

### ALPA is Warned of the Shortfalls, but Misrepresents Anyway

60.     These shortfalls were not simply results of faulty math of which ALPA was unaware.

61.     In a September 24, 2015 message posted to the pilots in his LEC, MEC member Ray said, "I expressed my concerns regarding the 3% slope claims/calculations to the negotiating committee chairman well before the above video [Webcast 1] was made."

62.     Also, in a September 25 post on "Jetflyers," a Facebook message board open only to FedEx pilots, Ray said, "they'd [the pay rate and signing bonus shortfalls] been heard before and the DOS rate claim in particular had been challenged before, well ahead of the video shoot."

63.     Ray never received any assurances that the Negotiating Committee would correct their mistake, nor did it offer any explanation as to why there was a shortfall. Instead, the Negotiating Committee recorded Webcast 1, posted the faulty numbers, and duped the entire pilot group into believing the Negotiating Committee had exceeded expectations. They did this despite actual knowledge that the pay scale and signing bonuses did not recoup the pilots' lost compensation.

## ALPA Is Repeatedly Informed of the Shortfalls

64.     Once the Tentative Agreement was up for ratification, few rank-and-file pilots noticed ALPA had misrepresented the true nature of the pay raise and signing bonus. However, ALPA was repeatedly informed about the shortfalls by at least two pilots who did notice.

65.     Plaintiff Valdez, after speaking with Don Ray, realized that ALPA's advertised numbers did not recoup the pilots' lost compensation. On September 23, 2015, Valdez emailed MEC Chairman Chuck Dyer ("Dyer") regarding the inconsistencies, complete with a detailed breakdown of the numbers. Dyer responded to Valdez, saying: "I have passed your queries to the Negotiating Committee and ALPA staff." Valdez never received a response from the Negotiating Committee or any other ALPA staff regarding his legitimate concern.

66.     Indeed, the only ALPA officer to accurately and truthfully deal with the issue was MEC member Don Ray, but his views were not communicated to the pilot group as a whole and marginalized by the MEC.

67.     On September 24, 2015, Ray posted a message to the pilots in his LEC titled, "Leading Pay Rates, or Mis-Leading Pay Rates?" expressing his concerns with the inconsistencies. This post also included the detailed math. He said, "approximately $105 million of your dollars are *missing* from the DOS (Date of Signing) pay rate and signing bonus claims made in those statements [the statements in Webcast 1]." (emphasis in original). Ray's message could only be seen by the MEC and Ray's LEC, Council 7.

68.     Ray again highlighted the inconsistencies in a September 29, 2015 message, which included the subtitle "$105 Million is Missing." Again, this message would have been accessible to the MEC, but only to those pilots in his LEC.

69.     Ray also told members of the MEC and Negotiating Committee that the numbers were wrong in an MEC meeting with the Negotiating Committee. Instead of addressing the issues in a forthright and honest manner, one member of the Negotiating Committee angrily told Ray, "What's your problem?"

**ALPA Misrepresents FedEx's Ability to Improve Retirement Benefits**

70.     The compensation shortfalls were not the only areas where ALPA misled the FedEx pilots. Retirement benefits were a major sticking point for many pilots, as the 2011 Interim Agreement only contained minor benefit increases, and ALPA misled the FedEx pilots concerning the company's financial ability to improve those benefits.

71.     The FedEx pilots have two primary retirement plans: the Defined Benefit Plan, or "A Plan", and the Defined Contribution Plan, or "B Plan." From the outset of negotiations, the MEC and Negotiating Committee repeatedly represented that significant A Plan improvements would be at the forefront of negotiations, and that FedEx could afford the upgrades.

72.     Specifically, a November 4, 2013 post from the Negotiating Committee to all FedEx pilots said, "our Section 28 retirement proposals are designed to improve retirement benefits. At the same time, we are steadfast in our need to maintain full retirement benefits in our Defined Benefit Plan [A Plan] at Age 60."

73.     On February 27, 2015, the Negotiating Committee repeated its resolve to fight for improved retirement benefits: "The Retirement (Section 28) discussion ought to be accompanied by trenches and barbed wire...The solutions are not complicated; they just cost money."

74.     On March 3, 2015, the Negotiating Committee again fueled optimism for improved retirement benefits, posting, "we continue to direct management's focus on the need

for improvements to our Defined Benefit and Defined Contribution plans, ensuring management recognizes we expect improvement for pilots already employed at FDX."

75.     On March 27, 2015, MEC Chairman Stratton said in a post to all FedEx pilots, "our contract goals are within the zone of reasonableness and the company can afford to pay." He reiterated that goal in a May 4, 2015 message by saying, "we seek improvements to our current retirement programs."

76.     On June 5, 2015, Stratton again reinforced the need for retirement improvements and FedEx's ability to pay them: "the only logical path and what we seek, is increased Define (sic) Benefit Plan amounts...we do not work for a bankrupt carrier. Our corporation markets at a premium our services which results in continued high levels of revenue. We have earned it. Management can afford it."

77.     When new MEC Chairman Dyer took office, he quickly expressed ALPA's goal of obtaining improved retirement benefits. In a July 9, 2015 post to all FedEx pilots, he said "our current DB and DC retirement plans need to be enhanced...we are not asking for dramatic changes; we are asking for reasonable improvements."

78.     Due to the repeated assurances from the MEC and Negotiating Committee, the FedEx pilots expected the Tentative Agreement to contain meaningful increases in retirement benefits.

79.     However, in August 2015, three days prior to an informal Tentative Agreement vote by the MEC, FedEx allegedly provided the Negotiating Committee with information stating that FedEx would incur massive liabilities if it agreed to the proposed retirement benefits. According to the Negotiating Committee, those liabilities would be public, significantly affecting FedEx's stock prices and discouraging investors.

80.     Although the Negotiating Committee and MEC had always represented that FedEx could afford the requested improvements to the pilots' A Plan and B Plan, they reversed course after the Negotiating Committee briefed the MEC regarding these supposed liabilities.  However, MEC member Don Ray said "it wasn't clear what they briefed" and that he was not convinced that the numbers the Negotiating Committee represented were accurate.

81.     After briefing the MEC, the Negotiating Committee agreed to FedEx's retirement proposal, which did not include any A Plan improvements and included only a modest 2% increase in B Plan benefits, well short of what the FedEx pilots expected and ALPA had consistently represented was affordable to FedEx.

82.     Although the retirement benefits were significantly lower than represented, the MEC approved the Tentative Agreement despite knowing the FedEx pilots were anticipating significantly higher benefits.

83.     Upon information and belief, the Negotiating Committee greatly exaggerated the liabilities provided by FedEx in order to get the MEC and the FedEx pilots as a whole to agree to the drastically lowered retirement benefits, including no improvement in A Plan benefits, and pass the Tentative Agreement.

**ALPA Misrepresents the Sick Leave Buyback**

84.     ALPA further misrepresented another significant benefit the FedEx pilots would receive under the Tentative Agreement.

85.     The Tentative Agreement included an End of Career Sick Leave/Advance Notice of Planned Retirement Bonus, referred to as a "Sick Leave Buyback."

86.     Ken Binder ("Binder"), a member of the Negotiating Committee, repeatedly stated in the "TA Webcasts" that the Sick Leave Buyback would be available to all pilots if they met certain criteria regarding their retirement.

87.     In "TA Webcast 3," Binder states,

Well any pilot on property will be able to get this bonus if they retire at age 60 or later and retire with 12 months of notice given to the Company and that their retirement date is on a Dec. 31 of any given year after their 60th birthday, or the month, any day in the month they turn 65. So it is for everybody on property.

88.     In TA Webcast 1, Binder emphasized that all FedEx pilots would be able to "max out every component" of the Sick Leave Buyback, which maxed out at $110,000.

89.     These statements were completely false. The maximum Sick Leave Buyback touted by ALPA is in fact unavailable to a majority of FedEx pilots. Only Wide-Body Captains, who make up approximately 40% of the seniority list, can realize the full Sick Leave Buyback. Even Wide-Body Captains will not be able reach the "maximum" amount of $110,000 unless they retire in 2019 or later. It is impossible for the other pilot positions to reach the "maximum amount." In fact, under the actual plan described in the Tentative Agreement, Narrow-Body First Officers cannot receive any Sick Leave Buyback.

90.     The prospect of receiving the maximum Sick Leave Buyback was a critical issue for many FedEx pilots. For instance, Plaintiff Castroverde, who will be retiring in 2017, voted in favor of the Tentative Agreement largely due to the prospect of receiving the maximum Sick Leave Buyback represented by Binder. However, since he plans to retire in 2017, he will thus not be eligible for the "maximum" value represented by Binder. Had he been aware of the true nature of the Sick Leave Buyback, he would have rejected the Tentative Agreement.

**ALPA Continues to Mislead the FedEx Pilots**

91.     While the Tentative Agreement was out for ratification, several other discrepancies between its actual and represented terms were revealed.

92.     In its October 1, 2015 message to all FedEx pilots, the Negotiating Committee broke down the Tentative Agreement's value by section. In the compensation section, the Negotiating Committee represented that the pilots' pay increases had a value of $1.24 billion. Unsurprisingly, this number was inflated as well. Using the actual pay rate slope increase, the pay increases actually received by pilots totaled $1.04 billion.

93.     The MEC and Negotiating Committee also repeatedly represented that the Tentative Agreement's value was worth an extra $60,000 per pilot per year. This was also inaccurate. In his September 29 message to his LEC, MEC member Don Ray informed them the Tentative Agreement was worth approximately $45,000 per pilot per year, not $60,000.

94.     Finally, in a supposedly confidential MEC document leaked to the pilots, the Negotiating Committee compared the new pay rates with those of American Airlines ("AA"), the industry leader in pilot compensation at the time. This document showed that the new Tentative Agreement provided higher pay rates than AA, giving the impression that the new Tentative Agreement made FedEx pilots the industry leader.  However, the Tentative Agreement's pay rates only exceed AA's for two months out of each year. The other ten months, AA pilots have a higher pay rate.

95.     Despite these facts, in an October 5, 2015 message, MEC voting member Kit Teeter, in an emphatic plea to encourage ratification, called the Tentative Agreement "industry leading in every section," supporting the false premise that the FedEx pilots would be receiving industry leading compensation.

**ALPA Leaks Confidential Information; the CBA is Put to a Vote**

96.     In August 2015, the Negotiating Committee and FedEx had finalized the Tentative Agreement and were ready to send it to the MEC for a vote. On August 17, 2015, a confidential MEC Only document entitled "Section by Section Highlights" ("MEC Only Document") was created to give the MEC a general overview of the Tentative Agreement.

97.     However, the MEC Only Document was leaked to all FedEx pilots prior to August 21, 2015. Prior to this time, only MEC members had access to the MEC Only Document.

98.     Upon seeing the MEC Only Document, many pilots pushed the MEC to send the Tentative Agreement out for a vote. The push was not because the pilots supported its terms, but because they wanted to see the entire TA.

99.     The leak substantially changed the MEC vote on the Tentative Agreement. One MEC voting member, Steve Donovan ("Donovan"), posted a message to his LEC. In the message, he said, "several of you e-mailed me insisting I vote yes so you could see the entire document. The emotional vote for me would have been to vote no." In the post, Donovan also called the person behind the leak "unscrupulous," and told Plaintiff Valdez that the leak "changed the game."

100.     The MEC Only Document was not the only piece of "confidential" information leaked by ALPA. Over the course of negotiations, the Negotiating Committee frequently briefed the MEC regarding the progress of its negotiations.  These briefings were held in executive-session of the MEC, which are not to be disclosed to the pilots.  During one of these briefings, the Negotiating Committee quoted a member of the National Mediation Board as having told them that the FedEx pilots would "never be released for self help."  This was a reference to the

Railway Labor Act's status quo provisions that preclude employees from striking unless released to do so by the National Mediation Board.

101.    Despite the required confidentiality of the MEC's executive sessions, the purported statement by the National Mediation Board regarding self help was leaked to the FedEx pilots.  The belief that they had no means for effective self help led many FedEx pilots to vote in favor of the Tentative Agreement, thinking that rejecting it would be pointless.

102.    MEC voting member Anita Shew, who voted against the Tentative Agreement, said that the MEC "fell apart" after the leak of the MEC Only Document. On August 27, 2015, the MEC held its official vote.  The Tentative Agreement passed 10 votes to 4.  It was now up for ratification.

### ALPA Continues to Misrepresent and Hushes Dissenters

103.    Despite being informed of the Tentative Agreement's shortfalls, the MEC and Negotiating Committee did nothing to address these issues or correct its prior misrepresentations. Instead, the MEC and its Negotiating Committee continued to aggressively push its deceptive deal.

104.    In order to sell the Tentative Agreement, the MEC set up "road shows" at each of FedEx's bases in September and October 2015. During these road shows, members of the MEC and Negotiating Committee gave presentations on the terms of the new Tentative Agreement. Pilots could attend in person, and the presentations were video recorded and posted on ALPA's website.

105.    The road show presentations failed to address any of the issues regarding the shortfalls. The compensation and signing bonus sections of the presentations only highlighted the

raw raises or signing bonuses the pilots would be receiving. Conspicuously absent from the presentations was any mention of the 3% slope.

106.    At a September 9, 2015, road show in Memphis, MEC member Don Ray showed up with posters highlighting the shortfalls in the Tentative Agreement.  However, he was not allowed to present and was relegated to the back of the room. The video recording did not include his posters, nor did it record Ray explaining the shortfalls. Upon information and belief, whenever Ray tried to speak up and explain the correct math of the Tentative Agreement, music in the conference room would be turned up to drown him out.

107.    The MEC and Negotiating Committee also held road shows on September 12, 16, 23, 25, and October 6. The presentations never changed in substance, despite the MEC and Negotiating Committee having knowledge of the pay and bonus shortfalls.

108.    The Negotiating Committee added to its marketing informal "hub turn" meetings in Memphis on October 7, 8, and 9, as well as informal "phone-in" sessions on October 14 and 15, designed to answer questions about the Tentative Agreement.  In an October 11, 2015, message sent to all FedEx pilots from Negotiating Committee Chairman Larsen he said, "it's important that you get the accurate information you need to make an informed decision[.]"

109.    Despite the apparent need for the pilots to get "accurate information," the Negotiating Committee again failed to address any issues with the compensation and signing bonus at these hub turn meetings or phone in sessions, despite having full knowledge of the shortfalls.

110.    While the Tentative Agreement was up for ratification, Plaintiff Freyre e-mailed MEC Chairman Dyer, asking him to present the FedEx pilots with a detailed and neutral breakdown of the Tentative Agreement's terms, including explanations of the shortfalls. Freyre

did not receive an adequate response, and no detailed breakdown was ever provided to the FedEx pilots.

111.    Also in Larsen's October 11 post, he referred the pilots to a "TA Q&A forum" on ALPA's website. According to Larsen, the Negotiating Committee had received "hundreds of questions."

112.    In the Q&A forum, the Negotiating Committee again willfully ignored the shortfall issue. The questions answered were hand-picked by the Negotiating Committee and broken down into section. In the section titled "compensation," there is no mention of any shortfall or the pay rate slope. The only question remotely related to pay rate increases was "Why are our pay rate increases less than cost of inflation?" where the Negotiating Committee conveniently skirted around the issue and avoided any mention of the pay rate slope the pilots would be receiving.

113.    On October 1, 2015 the Negotiating Committee sent out another post to all pilots selling the benefits of the Tentative Agreement, stating, "we have received some questions surrounding the costing of this tentative agreement." But in the post the Negotiating Committee again ignored the shortfall issue raised by at least MEC member Ray and Plaintiff Valdez, a question directly relating to the "cost of this tentative agreement."

114.    Instead, the Negotiating Committee diverted attention by playing to group-think: "We used the Economic and Financial Analysis Department of ALPA National ("E&FA"). E&FA used standard costing methodology with models specifically built for FedEx Express pilot demographics, operations, and CBA provisions...we are firmly confident that these methods produce reliable and accurate information." The Negotiating Committee claimed that it was

"firmly confident" in the E&FA's accuracy despite being repeatedly informed that the "almost 5%" signing bonus recoupment supposedly calculated by the E&FA was wildly inaccurate.

115.    Throughout the ratification process, the MEC was hostile to any opposing viewpoints on the Tentative Agreement.

116.    At each road show presentation, the presenting ALPA member would take questions from the audience. However, these questions were not recorded or posted. Although this was a hotly contested Tentative Agreement, the MEC and Negotiating Committee did not allow any dissenting presenters.

117.    When the voting process began, the MEC and Negotiating Committee did not allow any dissenting opinions to be posted on ALPA's website. At road shows, dissenters began to push for equal access on ALPA's website. Finally, on September 24, 2015, with less than a month until the voting deadline, the MEC finally approved a "Pro and Con" opinion section to appear on the website.

<b>The New CBA is Ratified</b>

118.    Throughout the entire ratification process the MEC and Negotiating Committee never corrected their misrepresentations regarding the pay rate increases, signing bonus, retirement, Sick Leave Buyback, Tentative Agreement value, or "industry leader" claims.

119.    Because MEC member Don Ray and Plaintiff Valdez could only communicate the true nature of the Tentative Agreement to a small group of pilots, the majority of FedEx pilots voted on the Tentative Agreement without knowing it had been misrepresented to them by the MEC and Negotiating Committee.

120.    On October 20, 2015, voting closed on the Tentative Agreement.  In the end, 2,098 pilots voted in favor of ratification with 1,559 voting against; it passed by only 270 votes.

121.    The Tentative Agreement was then signed by ALPA and FedEx, and became the new binding CBA on all FedEx pilots.

### The MEC Runs Out of Money

122.    On Plaintiffs' information and belief, ALPA chose to misrepresent the Tentative Agreement for one simple reason: the MEC was out of money to negotiate.

123.    The MEC's budget primarily comes from union dues, and is used to fund the committees run by the MEC, including the Negotiating Committee. In addition to its normal operating budget, the MEC also keeps cash in reserves. ALPA's national office ("ALPA National") does not have to approve a particular MEC's budget.

124.    Negotiations for the new CBA began in earnest in 2011. The MEC Secretary Treasurer at the time, Sean McDonald ("McDonald"), was not adequately briefing the MEC about the reserves.

125.    Additionally, Stratton, the MEC Chairman from 2011 to July 2015, changed the MEC's organization. Prior to his arrival, there was a Financial Oversight Committee to help rein in the MEC's spending. Stratton changed the Oversight Committee to a Financial Review Committee, which had significantly less authority to control and review the MEC's finances. The Financial Oversight Committee was then reintroduced in February 2016.

126.    From 2011 to 2015, the MEC grossly mishandled the FedEx pilots' dues money. In a joint post sent to only one LEC and its pilots on January 20, 2012, MEC members Chris Baker ("Baker") and Tony Hauserman ("Hauserman") said, "we are appalled at what we have seen concerning the guardianship of your dues money." Baker and Hauserman then detailed how they believed the MEC was squandering dues money, which included instances of paying

officers thousand of dollars to sit at home. Baker and Hauserman also seriously questioned the budget approval process.

127.    The MEC's out-of-control spending continued until July 2015, when Stratton and McDonald left their offices at the MEC.

128.    The new Secretary Treasurer, Richard Zins ("Zins"), was shocked at how little money remained for negotiations. When he took office, Zins informed Plaintiff Valdez that the MEC had only $1.2 million in reserves, down from more than $8.2 million at its high point in October 2011. Zins told Valdez that if negotiations continued, FedEx could "run them out of money."

129.    ALPA National retains a Major Contingency Fund ("MCF"), which it hypes as its "war chest" for funding MECs locked in struggles with their airline.  The fund is used to assist MECs with contract negotiations and strike preparations, among other purposes.

130.    Once he took office, Zins informed the MEC of its dire financial straits. Realizing that there would be no more money left to negotiate, two junior MEC members scrambled to acquire more funds from the MCF.

131.    Upon information and belief, new MEC Chairman Chuck Dyer ("Dyer") requested $5 million from the MCF to continue negotiations. ALPA National responded that it would need to see the MEC's books before approving his request. Upon information and belief, ALPA National had already discovered that the MEC's books were missing $1 million, and the MEC did not want to turn its books over to ALPA National, so the MEC withdrew the MCF request.

132.    Rick Irgens ("Irgens"), a former Negotiating Committee Chairman who worked as a consultant for the Negotiating Committee during the 2015 negotiations, was hesitant to

expose the MEC's financial situation to ALPA National. In an October 17, 2015 JetFlyers post he said, "yes ALPA National has money, but once we are out, accessing the MCF comes with massive Executive Council Oversight and control." Irgens did not want ALPA National to get involved with the negotiation in any way.

133.   The MEC spent approximately $14.5 million while negotiating the 2015 CBA, and at the end of the negotiations, it had only approximately $260,000 in its reserves.  As Zins predicted when he became MEC Treasurer, the MEC was out of money.

134.   The MEC never said publicly that it was low on funds, and its mismanagement of funds for years prevented it from utilizing the options of either assessing the FedEx pilots or seeking MCF money.  So the MEC and Negotiating Committee instead opted to aggressively push the passage of the Tentative Agreement, even if that meant misrepresenting key terms of the deal.

### FedEx Could Have Covered the Shortfalls

135.   The past fourteen years (post 9-11) have been difficult for much of the airline industry, with nearly all of the major passenger carriers having obtained bankruptcy protection before their consolidations with other carriers. FedEx, however, has avoided a similar economic downturn.

136.   Throughout the negotiation process, the MEC gave frequent updates on FedEx's economic status. In a June 20, 2015 message, the MEC called FedEx "highly profitable" with "the ability to afford to pay" the improvement the pilots were seeking.

137.   FedEx considered the new CBA to be cost neutral. In a Quarterly Earnings Call, Alan B. Graf, Jr., Executive Vice President & CFO of FedEx, called the contract a "win-win", which an article on The Motley Fool interpreted to mean the "new pilot contract won't hurt

earnings." The article said, "FedEx's management stated it won't impact the company's projected growth trajectory. Other productivity-enhancing initiatives will more than offset the pilots' higher pay."

138.   The value of the gains to the FedEx pilots in the 2015 CBA is miniscule compared to FedEx's overall revenue. Over the course of the six-year life of the 2015 CBA, the gains equate to roughly one half percent (0.5%) of FedEx's revenue, and only one percent (1%) of FedEx's operating expenses. FedEx could have more than afforded the shortfalls in the 2015 CBA.

139.   FedEx further showed its economic strength the day the 2015 CBA was ratified. Only a few hours after the 2015 CBA was ratified on October 20, 2015, FedEx announced its acquisition of the European package delivery company TNT. FedEx paid the majority of the $4 billion purchase price in cash.

## Class Action Allegations

140.   Plaintiffs bring their claim both individually and as representatives of the proposed Class under Rule 23, F.R.C.P.

141.   The proposed Class is defined as follows:

All FedEx pilots entitled to vote on the ratification of the 2015 CBA who were at any time subject to its terms.

142.   The proposed Class is so numerous and geographically diverse that joinder of all members is impracticable. According to ALPA, there are approximately 4,190 pilots in the proposed Class.

143.   The most important questions of law and fact raised by this case are common to all of the members of the proposed Class. The important factual issues include:

(a)     Did ALPA intentionally or recklessly misrepresent the true nature of the 2015 CBA, particularly the pay rate increases, signing bonuses, retirement benefits, Sick Leave Buyback, overall value, and/or "industry-leading" status to the FedEx pilots?

(b)     Did ALPA arbitrarily or in bad faith refuse to address the shortfalls in the 2015 CBA, despite being repeatedly informed of those shortfalls?

(c)     Did ALPA intentionally or recklessly misrepresent the true nature of the 2015 CBA to avoid confronting the fact that the MEC did not have money remaining to negotiate with FedEx?

(d)     Did ALPA intentionally or recklessly exaggerate FedEx's supposed "liabilities" relating to the pilots' proposed retirement benefit package in an attempt to induce the FedEx pilots to accept a lesser deal?

(e)     Did ALPA intentionally leak the MEC Only Document and the National Mediation Board's "self help" comment to encourage passage of the Tentative Agreement?

(f)     Did ALPA intentionally or recklessly hush dissenters of the Tentative Agreement to encourage its ratification?

(f)     Would the CBA vote had been different, either in the MEC stage or the ratification stage, had ALPA not intentionally or recklessly misrepresented the 2015 CBA's true nature?

(g)     If the FedEx pilots or the MEC had rejected the Tentative Agreement, would FedEx have improved its offers and ALPA obtained a better deal for the FedEx pilots?

144.    Important common legal questions include:

(a)     Did ALPA breach its duty of fair representation to Plaintiffs and the proposed Class in one or more of the respects alleged?

(b)     Were Plaintiffs and the proposed Class damaged by ALPA's breach of its duty of fair representation as alleged, and did ALPA's breach of its duty of fair representation cause the Plaintiffs and the proposed Class damage?

(c)     If ALPA should assert any generally applicable affirmative defenses, do such defenses have merit?

145.     Plaintiffs' claims are typical of the claims of the members of the proposed Class, and Plaintiffs do not have any conflicts of interest with members of the proposed Class.

146.     Plaintiffs understand their duties to the proposed Class, and will fairly and adequately represent and protect the interests of the Class.

147.     Plaintiffs have retained Jacobson Press & Fields P.C. ("JPF") as lead counsel to represent them and the absent members of the proposed Class, and Bourland Heflin Alvarez Minor & Matthews, PLC as local counsel. JPF includes lawyers with extensive experience representing pilots in class actions against unions. These lawyers have successfully brought and concluded class actions in the past, and have tried class action cases to verdict and final judgment, including a case against ALPA. Bourland Heflin Alvarez Minor & Matthews, PLC is a respected litigation firm highly qualified to assist JPF.

## COUNT I-BREACH OF THE DUTY OF FAIR REPRESENTATION

148.     Plaintiffs hereby incorporate in full all preceding allegations.

149.     At all relevant times, ALPA was the certified bargaining representative of the FedEx pilots.

150.     The FedEx pilots' MEC and Negotiating Committee are ALPA's agents for the purposes of negotiating and executing new CBAs.

151.     A union owes all of its members the duty to fairly represent them. A union violates this duty when its conduct towards its members is arbitrary, discriminatory, or in bad faith. Intentional misrepresentations and "silent fraud" made by a union to its members constitute bad faith, and reckless misrepresentations constitute arbitrary conduct.

152.     ALPA owed Plaintiffs and the proposed Class of FedEx pilots the duty of fair representation throughout the ratification process.

153.   Among other ways, ALPA breached its duty of fair representation to the FedEx pilots in the following ways:

(a)   ALPA intentionally or recklessly misrepresented the pay rate increase that the FedEx pilots would receive. Specifically, it represented that the FedEx pilots only needed an 8% pay raise to recoup the FedEx pilots' lost compensation and they were receiving a 10% raise. In actuality the FedEx pilots needed an 11.46% raise to recoup lost compensation. ALPA made this representation despite having actual knowledge of the shortfall in the pay rate scale prior to any representation.

(b)   ALPA intentionally or recklessly misrepresented the nature of the signing bonus the FedEx pilots would receive. Specifically, it represented that ALPA had calculated that the signing bonus recouped "almost 5%" year-over-year, when it actually recouped less than 3%. ALPA made this representation despite having actual knowledge of the shortfall in the signing bonus prior to any representation.

(c)   ALPA repeatedly represented that a significant increase in retirement benefits was a crucial negotiating point. It then intentionally or recklessly presented exaggerated "company liability" numbers allegedly provided by FedEx in an attempt to convince the FedEx pilots to accept only a minor increase in retirement benefits.

(d)   ALPA intentionally or recklessly misrepresented the Sick Leave Buyback available to the FedEx pilots. Specifically, ALPA represented that the maximum Sick Leave Buyback would be available to all FedEx pilots, when in fact the maximum value was only available to a minority, and some FedEx pilots would be completely ineligible.

(e)   ALPA intentionally leaked the MEC Only Document to the FedEx pilots. This was a successful yet bad faith attempt to encourage the FedEx pilots to pressure their MEC voting members to send the Tentative Agreement to a vote.

(f)   ALPA intentionally leaked the National Mediation Board's confidential "self help" comment to the FedEx Pilots while the Tentative Agreement was up for ratification. This was a bad-faith attempt to encourage ratification.

(g)    While the Tentative Agreement went to the FedEx pilots for a vote, ALPA intentionally or recklessly refused to address the shortfalls in the Tentative Agreement on multiple occasions. ALPA was repeatedly informed of the shortfalls yet did nothing, despite ALPA's stated intent to get the FedEx pilots "accurate information."

(h)    ALPA intentionally hushed dissenters of the new Tentative Agreement in a bad-faith attempt to get it ratified by refusing to let MEC members present dissenting opinions at road shows and not posting any dissenting opinions of the Tentative Agreement on its website until the voting deadline was less than a month away.

(i)    ALPA intentionally or recklessly posted the total value gained by the Tentative Agreement as $200 million more in total and $15,000 more per pilot than it actually was. This was a bad-faith misrepresentation designed to encourage ratification.

(j)    ALPA intentionally or recklessly misrepresented the FedEx pilots' new pay rates in the MEC Only Document as being consistently higher than American Airlines pilots' pay, when in reality the rates were only higher for two months out of the year.

154.    ALPA's misrepresentations and actions surrounding the ratification of the 2015 CBA caused the FedEx pilots significant damage. Had ALPA been forthright in all aspects regarding the 2015 CBA, the vote would have been different, either at the MEC or the FedEx pilots stage. Furthermore, considering FedEx's strong financial situation and dependence upon its pilots, FedEx would have acceded to union demands for additional compensation had the FedEx pilots or the MEC rejected the Tentative Agreement.

155.    As a result, the FedEx pilots suffered damages. Had the pay rate increases and signing bonus been on the same 3% that ALPA represented was needed to recoup lost compensation, the FedEx pilots would have received approximately $105 million more over the life of the 2015 CBA. Furthermore, had ALPA not acceded to FedEx's retirement proposal, the FedEx pilots would have received a significant increase in retirement benefits, the amount of which is unknown at this time. Additionally, if all FedEx pilots were eligible for the Sick Leave

Buyback as ALPA represented, hundreds of pilots retiring over the life of the 2015 CBA would have received thousands of dollars more per pilot, the exact amount is unknown at this time.

## Prayer for Relief

WHEREFORE, Plaintiffs, individually and on behalf of the proposed Class, request the Court enter the following:

(a)  An Order certifying the Class as defined herein, appointing Named Plaintiffs as representatives of the Class and appointing Jacobson Press & Fields P.C. and Bourland Heflin Alvarez Minor & Matthews, PLC as Class counsel;

(b)  A judgment in favor of Plaintiffs and the Class against ALPA in an amount to be proven at trial;

(c)  A judgment in favor of Plaintiffs and against ALPA for the costs of bringing this action and attorneys' fees; and

(d)  Any other relief to which the Named Plaintiffs and the Class are entitled.

JURY TRIAL DEMANDED.

Respectfully submitted,


 s/ Cary A. Press by Kenneth P. Jones with permission
Allen P. Press
Cary A. Press
JACOBSON PRESS & FIELDS P.C.
168 N. Meramec Ave. Suite 150
St. Louis, MO  63105
314.899.9789 (phone)
press@archcitylawyers.com
carypress@archcitylawyers.com
*Counsel for Plaintiffs (admission pending)*

 s/ Kenneth P. Jones
Kenneth P. Jones (TDN 16168)

BOURLAND HEFLIN ALVAREZ
MINOR & MATTHEWS, PLC

5400 Poplar Ave. Ste. 100
Memphis, TN  38119
901.683.3526 (phone)
901.763.1037 (facsimile)
kenjones@bhammlaw.com
*Counsel for Plaintiffs*